**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY PEREZ,<br><br>       Plaintiff,<br><br>  v.<br><br>MICHAEL ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Civil Action No. 2:10-6256-SDW<br><br><br><br>**OPINION**<br><br>January 19, 2012 |

**Wigenton, District Judge,**

  Before the court is Plaintiff Anthony Perez's ("Plaintiff" or "Perez") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge James Andres's ("ALJ") denial of Perez's claim for Social Security Disability Insurance benefits ("SSDI benefits") under 42 U.S.C. § 405(g).  The Commissioner, pursuant to Local Civil Rule 9.1, seeks a judgment affirming his final decision that Plaintiff is not entitled to SSDI benefits under the Social Security Act (the "Act").  (Def.'s Br. 1.)  This court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(g).  Venue is proper under 28 U.S.C. § 1391(b).  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons stated herein, this Court **AFFIRMS** the Commissioner's decision.

**BACKGROUND**

On May 16, 2007, Plaintiff filed an application for SSDI benefits alleging disability since June 15, 2004, due to his medical conditions. (R. at 9.) The application was initially denied and later denied upon reconsideration. (*Id*. at 9.) Subsequently, on September 20, 2008, Plaintiff timely requested a hearing before an ALJ. (*Id*.)

On November 24, 2009, a hearing was conducted before the ALJ. (*Id*.) On December 18, 2009, the ALJ denied Plaintiff's application. (*Id*.) Thereafter, on August 6, 2010, Plaintiff requested a review of the ALJ's decision with the Appeals Council alleging various legal errors. (*See* R. at 120-31.) On October 4, 2010, the Appeals Council affirmed the ALJ's decision. (*Id*. at 1.) On December 3, 2010, Plaintiff filed an appeal with this Court challenging the denial of his request for SSDI benefits. (*See* Compl.)

**FACTS**

   **A. Employment History**

Plaintiff was born in 1967, in the Dominican Republic, and immigrated to the United States in 1993. (R. at 61; Pl.'s Br. 3.) Plaintiff received a Bachelor of Arts degree in the Dominican Republic, and obtained a Master's Degree in Communication Arts from the New York Institute of Technology. (R. at 61.) Plaintiff later became employed as a reporter/anchor for a Spanish news television station, Univision. (*Id*. at 62-63, 89.)

On May 9, 2001, while covering a news story for Univision, Plaintiff was allegedly brutalized by a police officer. (*Id.* at 63.) As a result, Plaintiff suffered injuries to his back, and left knee. (*Id.* at 12-13.) Due to these injuries, Plaintiff was out of work for six months. (*Id.* at 13.) Upon recovery, Plaintiff returned to his job as a reporter and reinjured his leg. (Id. at 63.) Plaintiff's contract with the news station was not renewed. (R. at 85.) Consequently, Plaintiff began working as a real estate agent. (*Id*. at 88.) On June 15, 2004, Plaintiff ceased working

because he began to develop symptoms of Post-Traumatic Stress Disorder ("PTSD"), depression, had a herniated disc in his lumbar spine, and pain in his left ankle, knee, and hip. (*Id*. at 88.)

## B. Medical History

### i. Back Impairment

On May 26, 2001, an MRI of the lumbar spine revealed probable annular fissure degeneration at L5-S1, with central protrusion abutting the S1 roots without displacement. (*Id*. at 278.) Dr. Jonathan Lester ("Lester") prescribed the following ambulatory remedies: epidural injections, and the narcotic pain killers Vicodin and Oxycontin. (*Id*. at 168-222.) On July 16, 2003, April 16, 2004, and June 18, 2004, Dr. Abe Halizer ("Halizer") at the Hackensack University Medical Center Pain Clinic, also administered epidural injections. (*Id.* at 145, 149, 153.) On December 9, 2005 and January 13, 2006, Lester administered epidural injections. (R. at 168-222.)

On September 26, 2003, Dr. Ari Ben-Yishay ("Ben-Yishay"), of Comprehensive Spine Care examined Plaintiff. (*Id*. at 222-223.) Ben-Yishay observed that Plaintiff walked with a non-antalgic gait, and could heel and toe walk without difficulty. (*Id*. at 223.) Additionally, Ben-Yishay's exam indicated mild tenderness over the lumbar paraspinal muscles and mild exacerbation of back pain. (*Id.*)

On February 16, 2004, Plaintiff went to Hackensack University Medical Center complaining of lower back pain. (*Id*. at 135.) Plaintiff underwent a lumbar x-ray, which showed that Plaintiff's bone density was normal. (*Id*. at 140) Plaintiff was diagnosed with lumber strain, and Plaintiff was released in stable condition. (R. at 139)

On September 20, 2005, Plaintiff was examined by Ben-Yishay in response to numbness and pain over his left thigh and lower back. (*Id*. at 168.) The exam revealed mild to moderate tenderness in the lumbar spine, with reduced range of motion. (*Id.* at 169.) Ben-Yishay noted the

presence of mild degenerative changes at L5-S1 and S1-S2 disk. (*Id.*) Ben-Yishay diagnosed lumbar disc herniated nucleus pulposus ("HNP") without myelopathy, lumber disc degeneration, and lumbar radiculitis/radiculpathy. (*Id*. at 169) Ben-Yishay determined that Plaintiff was disabled and ordered an updated lumbar MRI, and prescribed Vicodin. (*Id*. at 170) On September 27, 2005, another lumber MRI showed disc desiccation at L5-S1 level with a posterior annular bulge impinging upon the thecal sac, and partial fusion of the T11-12 vertebral bodies. (R. at163)

On October 25, 2005, Plaintiff complained of continued back pain with some numbness and tingling. (*Id*. at 172.) Ben-Yishay reviewed the September 27, 2005, MRI results and indicated that Plaintiff could return to work on October 26, 2005, but should avoid repetitive bending, and could stand or sit for as long as tolerable. (*Id*. at 174.)

On January 24, 2006, Ben-Yishay examined Plaintiff, and observed that Plaintiff experienced "only mild back discomfort." (*Id*. at 187.) In February 2006, Ben-Yishay examined Plaintiff and noted that sensation was "mildly" diminished in the left L4 distribution, and there was "mild" back pain with lumbar flexion and extension, but Plaintiff's gait was normal. (*Id*. at 190.) Plaintiff informed Ben-Yishay that his radicular pain improved after receiving the epidural shots. (*Id*. at 189.) Ben-Yishay again assessed Plaintiff as disabled, but noted that Plaintiff was not a candidate for back surgery, and recommended continued exercise. (R. at 189-191.)

On February 28, 2006, Dr. Jonathan Lester ("Lester") treated Plaintiff for pain management. (*Id*. at 192.) Lester noted that hydrocodone helped control Plaintiff's pain and allowed him to function on a daily basis, and also care for his child during the daytime. (*Id.*) In April 2006, Lester noted that Plaintiff's low back pain was "reasonably controlled . . . without significant side effects." (*Id*. at 202.) Lester found that Plaintiff could return to work on April 4, 2006, lifting up to 20 pounds, and avoiding repetitive bending and commercial driving. (*Id*. at

4

202-03.) Lester also changed Plaintiff's medication from Oxycontin to Hydrocodone, due to Plaintiff's discomfort with Oxycontin. (*Id*. at 206.) In June 2006, Plaintiff reported no side effects, and Lester again noted that Plaintiff could work with the same restrictions indicated in February 2006 except the restriction regarding performing commercial driving. (R. at 211.)

    ii.    **Knee Impairment**

On May 26, 2001, an MRI of the Plaintiff's left knee showed degeneration of the posterior horn of the medial meniscus, but no evidence of meniscal tear, and edema. (*Id*. at 279.) In the summer of 2001, Plaintiff underwent knee surgery, and subsequently, physical therapy. (*Id*. at 65, 63.) Plaintiff returned to work after the knee surgery, but in April 2002, Plaintiff reinjured his knee. (*Id.* at 163.)

On September 26, 2003, after meeting with Plaintiff, Ben-Yishay noted that reflexes were equal and symmetric at the knees and ankles. (*Id*. at 223.) Ben-Yishay also noted, that the straight leg raising test caused some sided back pain without radicular pain. (*Id*.)

On April 20, 2005, Dr. James Cahill ("Cahill") diagnosed Plaintiff as having a patella femoral syndrome and chondral injury in his knee necessitating arthroscopic repair, as well as a series of synvisc injections. (R. at 304-320). Cahill also noted moderate crepitus in the left knee as well as atrophy of the quadricep muscle above the affected knee joint. (*Id*. at 309.)

On September 20, 2005, Ben-Yishay noted that Plaintiff had tenderness in the left knee with full range of motion and numbness to pinprick. (*Id*. at 169.) The straight leg raising test caused pain in the left hip and knee, but not in the lower back, and there was no gross muscle weakness and mild quadricep atrophy. (*Id*.)

On September 26, 2005, Plaintiff was examined by Douglas Holden ("Holden") of Garden State Orthopedic Associates for treatment of his knee impairment. (*Id*. at 331.) Holden recommended an MRI. (*Id*.) On October 17, 2005, an MRI revealed post-surgical changes in the

medial meniscus. (*Id*. at 321.)  After reviewing the MRI results, Ben-Yishay stated that Plaintiff could return to work on October 26, 2005. (R. at 174.)

In November 2005, an exam with Holden showed tenderness in Plaintiff's left knee, but good range of motion and no effusion. (*Id*. at 325.)  After receiving an epidural injection in December 2005, Plaintiff reported significant overall improvement in back and leg symptoms. (*Id*. at 181.)  Subsequently, Ben-Yishay determined that Plaintiff was disabled and recommended a second steroid injection because Plaintiff had a "good response" to the one he previously received in December 2005. (*Id*. at 181-182.)

On January 24, 2006, Ben-Yishay examined Plaintiff. (*Id*. at 187.)  Plaintiff experienced mild left sciatic notch tenderness, but Plaintiff's leg was neurologically intact, and motor strength and gait were normal. (*Id*.)  Ben-Yishay also noted that no further injections were warranted, and recommended a home exercise program. (R. at 187.)

In February 2006, Plaintiff returned to Ben-Yishay and reported intermittent left thigh numbness and tingling, but added that his radicular pain was much improved after receiving the epidural injections. (*Id*. at 189.)  Ben-Yishay's exam showed "mildly" diminished left knee jerk. (*Id*. at 190)   On February 28, 2006, Plaintiff returned to Lester for another examination. (*Id*. at 193.)  Lester's examination of Plaintiff showed: (1) diminished pinprick sensation along the left thigh and leg, but no gross lower extremity weakness, (2) symmetrical reflexes at the knees and ankles, and (3) a negative straight leg raising test. (*Id*.)  In June 2006, Lester indicated that Plaintiff could work full time, lifting up to twenty pounds and avoiding repetitive bending. (*Id*. at 211.)  Plaintiff returned to Lester again for an examination in July 2006. (R. at 213.)  Lester's July 2006 exam showed no lower extremity weakness. (*Id*.)  In October 2006, Plaintiff informed Lester of continued left leg pain. (*Id*. at 215.)  An examination revealed full muscle strength in the lower extremities, and a negative straight leg raising test. (*Id*. at 216.)  In January 2007, another

examination with Lester revealed no changes from the October 2006, medical determinations. (*Id*. at 220.)

### iii. Mental Impairment

Following the May 2001 incident with the police, Plaintiff sought psychiatric treatment with Dr. Rueben Gross ("Gross"). (*Id*. at 157.) From May 17, 2001 until February 3, 2003, Plaintiff was treated by Gross. (R. at 285-286.) Gross diagnosed Plaintiff with PTSD, major depressive disorder, and reported that Plaintiff's condition had improved with therapy. (*Id*. at 286, 288.)

On September 8, 2003, Dr. Terry Tuchin ("Tuchin") conducted an initial evaluation of Plaintiff and also diagnosed him with PTSD. (*Id*. at 267) On October 7, 2004, Tuchin reevaluated Plaintiff and also diagnosed him with mood disorder. (*Id*.)

In February 2005, Plaintiff began treatment with Dr. Luis Handel ("Handel")[1]. (*Id*. at 371.) Handel diagnosed Plaintiff with PTSD, and adjustment mood disorder with depressed mood. (*Id*. at 373.) Handel also concluded that Plaintiff had a Global Assessment of Functioning ("GAF") score of 40, which indicates severe psychiatric impairment.[2] (R. at 373.) Handel treated Plaintiff with weekly psychotherapy sessions, and psychotropic medications including Welbutrin, and Xanax. (*Id*. at 340-371.)

In September 2006, Plaintiff reported flashbacks, panic attacks, and low energy, however later that month Plaintiff indicated he was feeling better. (*Id*. at 367.) Plaintiff also denied suicidal thoughts. (*Id*.) Throughout October, November, and December 2006, Plaintiff denied

---

[1] Plaintiff's Brief misspells Handel's last name. Plaintiff's brief spells his last name as follows: H-A-N-D-A-L. The proper spelling is H-A-N-D-E-L, per the doctor's report in the record. (R. at 367.)

[2] The GAF is part of the diagnostic criteria set forth in the Diagnostic Manual of Mental Disorder ("DSM") Volume IV which was published by the American Psychiatric Association in July 2000. The GAF scale set forth in the DSM is a 1-100 point scale that measures a patient's overall level of psychological, social, and occupational functioning, and is often used to determine eligibility for treatment and disability benefits. A rating between 31-40 indicates impairment in reality testing, or major impairment in several areas, such as in social, occupational, or school functioning.

suicidal thoughts and reportedly benefited from treatment. (*Id*. at 365-367) Mental status exams between May and July 2007 showed Plaintiff was fully oriented. (*Id*. at 352-355.) Plaintiff also spoke in a normal tone, possessed normal reasoning, judgment, intact thought processes and no loosening of associations. (R. at 352-355.) In September 2008 Plaintiff's treatment with Handel ceased. (*Id*. at 340-48.)

On October 18, 2006 and February 22, 2007, Plaintiff was examined by Dr. Mario Finkelstein ("Finkelstein") for independent psychiatric evaluations. (*Id*.at 322-339.) Finkelstein also diagnosed Plaintiff with PTSD with superimposed major depression, and assessed a GAF score of 60.[3] (*Id.*)

### C. Medical Evidence

On June 21, 2008, Plaintiff underwent a consultative psychiatric examination with Dr. Alec Roy ("Roy") as required by the SSA. (*Id*. at 229; Pl.'s Br. 7.) Roy concluded that Plaintiff was severely psychiatrically impaired and concurred with the diagnosis of PTSD, along with co-morbid depression. (*Id*. at 231.) Roy found that Plaintiff had a GAF score of 40, indicating a severe mental impairment. (*Id*. at 231; Pl.'s Br. 7.)

On June 27, 2008, Dr. Frances Hecker ("Hecker") an SSA medical consultant, reviewed the medical record and completed a Psychiatric Technique Review Form ("PTRF"). (R. at 233.) Hecker assessed Plaintiff's psychiatric impairment under various sections of Listing 12.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (*Id*. at 233-246.) Hecker found that Plaintiff had "moderate" restriction of activities of daily living and "moderate" difficulties maintaining concentration, persistence, or pace, but mild difficulties in maintaining social function and no episodes of decompensation. (*Id*.)

---

[3] A GAF of 51-60 is indicative of "moderate symptoms." (e.g. flat effect, circumstantial speech, and occasional panic attacks). (Pl.'s Br. 7; Def.'s Br. 11.)

Hecker also provided a Mental Residual Functional Capacity Assessment ("MRFCA"). (*Id*. at 247-250)  In executing the MRFCA, Hecker assessed Plaintiff as being "not significantly limited" to "moderately limited" in all areas of understanding and memory.  (*Id*.)  Hecker found that Plaintiff is able to maintain pace, persistence and concentration in simple routine tasks, and is able to relate appropriately to co-workers and the public in limited contact settings.  (*Id*.)

On July 9, 2008, Plaintiff saw Tuchin for a second independent examination during which Plaintiff stated that Handel's treatment was "really helping."  (R. at 268-69.)  Tuchin concluded that Plaintiff did not appear able to return to work in his previous capacity.  (*Id*. at 271-72.)

### D. Residual Functional Capacity

On July 9, 2008, pursuant to the Commissioner's request, Dr. Richard Mills ("Mills") met Plaintiff for a consultative exam.  (*Id*. at 251; Def.'s Br. 8.)  Mills noted that range of motion was limited in Plaintiff's knee and hip, and back.  (*Id*. at 252-54.)  Mills asserted that Plaintiff could stand for five minutes, walk about 200 meters, sit for thirty minutes, and lift up to twenty pounds.  (*Id*. at 252.)

On July 30, 2008, an SSA medical consultant, Dr. Norman W. Schachtel ("Schachtel"), reviewed Plaintiff's records and provided a Physical Residual Functional Capacity Assessment ("RFC").  (*Id*. at 257-263.)  Schachtel concluded that Plaintiff could lift and/or carry up to 20 pounds and sit about six hours in an eight-hour workday. (R. at 257-263)  Schachtel also concluded that Plaintiff could stand and/or walk at least two hours in an eight-hour workday, and also noted that Plaintiff could stand/walk for four hours.  (*Id*.)  Schachtel opined that there was "no medical credibility" for Mills' statements that Plaintiff could only stand for five minutes and was only able to walk 200 meters.  (*Id*.at 262)

9

### E. Plaintiff's Testimony

On November 24, 2009, Plaintiff testified before the ALJ. (*Id*. at 58.) Plaintiff testified that he needs to use a cane when he is not sure of the surface that he will be walking on or going to an unfamiliar place. (*Id*. at 64-65.) Plaintiff testified that he could not stand for more than ten minutes or sit for more than twenty minutes without discomfort. (*Id*. at 65-66) Plaintiff also testified that he: (1) could not read a paragraph without being distracted, (2) had lost his sense of time, and (3) was unable to get back to a normal life. (R. at 67-68.) Plaintiff stated that he does not do household chores, but does look after his ten-year old daughter. (*Id*.) Plaintiff also stated that he has nightmares and recurring thoughts about his altercation with the police, and becomes alarmed when he hears a siren or sees police and firemen. (*Id.*)

## LEGAL STANDARD

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

However, if the factual record is adequately developed, "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This court is required to give substantial weight and deference to the ALJ's findings. *Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." Cruz, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**DISCUSSION**

An individual will be considered disabled under the Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C.A § 423(d)(1)(A) (2004). The physical or mental impairment must be severe enough to render the individual "not only

11

unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A) (2004). A claimant must show that the "medical signs and findings" related to his ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged ." 42 U.S.C.A § 423(d)(5)(A) (2004).

    The SSA utilizes a five-step sequential analysis to determine disability. *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 480 (3d Cir. 2007) (citing 20 C.F.R. § 404.1520 (a)(4)(i)-(v) (2012)). The United States Supreme Court describes the evaluation process as follows:

> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990) (internal citations omitted). The burden of persuasion lies with the claimant in the first four steps. *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 763 (3d Cir. 2009). Once the claimant shows that the impairment prevents him from performing his past work, the burden shifts to the Commissioner to demonstrate "that the claimant still retains a residual functional capacity to perform some alternative, substantial, gainful activity present in the national economy." *Id.* (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)).

    In this instant case, the ALJ denied Plaintiff SSDI benefits at step-five, ultimately determining that there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform. (R. at 9.) On appeal, Plaintiff argues that the ALJ's decision was not based on substantial evidence as required by 42 U.S.C. § 405(g) and that he erred as a matter of law in evaluating the case. Plaintiff's argument has four grounds: 1) the ALJ failed to recognize that the medical evidence regarding Plaintiff's impairments was uncontroverted; 2) the ALJ's RFC conclusion was not based on substantial medical evidence; 3) the ALJ erred by failing to require the testimony of a vocational expert to testify as to how Plaintiff's mental impairment would limit his occupational base; and 4) the ALJ failed to properly consider Plaintiff's allegations concerning pain and symptoms. (*See generally*, Pl.'s Br.)

The Commissioner, however, argues that: 1) the ALJ's decision is supported by substantial evidence; 2) SSDI benefits are not available to an individual that is able to work; Plaintiff was not disabled by his impairments; 3) the ALJ properly evaluated medical and opinion evidence, and determined that Plaintiff could perform a range of light work; 4) the ALJ properly evaluated Plaintiff's credibility; and 5) the ALJ properly determined that Plaintiff could do other work. (*See generally*, Def.'s Br.) For the reasons expressed below, this Court affirms the ALJ's decision because substantial evidence supports the ALJ's findings.

A. **Step One: Whether Plaintiff has performed any "substantial gainful activity"**

SGA is work that involves significant physical or mental activities and is done for pay or profit. *See* 20 C.F.R. § 416.972(a)-(b) (2012). If a claimant is found to be engaged in SGA, the disability claim will be denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ determined that Plaintiff has not engaged in any SGA since November 20, 2006, the date of his SSI application. (R. at 11.)

**B. Step Two: Whether Perez has a "severe" impairment or combination of impairments that affects his ability to do basic work activities.**

In executing step two, the ALJ must consider all symptoms and the extent to which these symptoms can reasonably be accepted with objective medical evidence and other evidence. *See* 20 C.F.R. § 416.929 (2012). Under the applicable regulations, an impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1521(b) (2012).

The ALJ, at step two, determined that Plaintiff has a severe impairment or combination of impairments limiting his physical and mental ability to do basic work. (R. at 11.) In assessing the severity of Plaintiff's affective mood disorder and anxiety disorder, the ALJ considered the four broad areas of functioning specified in the Commissioner's regulations for determining the severity of a mental impairment. (*Id*. at 15-16.)[4]

**C. Step Three: Whether Perez's Impairment Matches or is Equivalent to a Listed Impairment**

At step three, the ALJ must "compare the claimant's medical evidence to a list of impairments presumed severe enough to negate any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 F. App'x. 376, 379 (3d Cir. 2004). When a claimant's impairments meet or equal a listing, "disability is conclusively established and the claimant is awarded benefits." *Knepp*, 204 F.3d at 85. The Third Circuit requires the ALJ to "fully develop the record and explain his findings at step three." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). The ALJ is required to issue more than just a conclusory statement that a claimant does not meet the listings. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (*citing Burnett v. Comm'r of Soc. Sec. Admin*., 220 F.3d at 119-20). "*Burnett*[, however,] 'does not require the ALJ to use

---

[4] The four areas of functioning are: (1) activities of daily living, (2) maintaining social functioning (3) maintaining concentration, persistence, or pace, and (4) episodes of decompensation. *See* 20 C.F.R. § 416.920a(b)(3).

particular language or adhere to a particular format in conducting his analysis.'" *Padilla v. Comm'r of Soc. Sec.*, No. 09-2897, 2010 WL 2346650 at *5 (D.N.J. June 9, 2010) (quoting *Jones v. Barnhart*, 364 F.3d 502, 505 (3d Cir. 2004)).

The ALJ, at step three, determined that Plaintiff did not have an impairment or combination of impairments that matched or was equivalent to a listed impairment. (R. at 11-12.) In assessing whether or not the Plaintiff had an impairment that would match a listed impairment, the ALJ analyzed and compared Plaintiff's medical evidence in accordance with the applicable listings in 20 C.F.R. pt. 404 subpart P appendix. 1. 20 C.F.R. § 404.1525 (2012). The ALJ explained his findings in detail and found that Plaintiff's mental impairments, left knee pain, and back pain, either singly or in combination, did not meet or equal the applicable listings provided by the SSA. (R. at 11-12.)

In finding that Plaintiff's back pain did not meet or equal the applicable listed impairment, the ALJ found no evidence that Plaintiff had either "a disorder of the spine with evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion, atrophy and/or muscle weakness, accompanied by sensory or reflex loss and positive straight leg raising in the sitting and supine positions," or that Plaintiff was unable to ambulate effectively. *See* 20 C.F.R. pt. 404 subpart P app. 1 (2012); (R. at 11-12.)

In finding that Plaintiff's left knee pain did not meet or equal the applicable listed impairment, the ALJ found no evidence that Plaintiff was unable to ambulate effectively as required to meet or equal Listings 1.02A or 1.03. *See id.*

In finding that Plaintiff's mental impairments did not meet or equal the applicable listed impairment under Listings 12.04 and 12.06, the ALJ acknowledged that Plaintiff has major depression and chronic PTSD. However, the ALJ noted that neither impairment results, either singly or in combination with another impairment, "[to] at least two of the following: marked

15

restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. pt. 404 subpart P app. 1 (2012); (R. at 12.)

### D. Whether the ALJ properly determined Plaintiff's RFC

If a claimant's impairment does not meet or equal a listed impairment, the ALJ must determine Plaintiff's RFC before proceeding to the fourth step of the analysis. *See* 20 C.F.R. 404.1520(e) (2012). The RFC will then be used in the fourth step. *See id.* In making this determination the ALJ must consider all of Plaintiffs impairments, including those that are not severe. *See* 20 C.F.R. § 404.1520(e) (2012); 20 C.F.R. § 404.1545 (2012); and SSR 96-8. When considering Plaintiff's symptoms, the ALJ must first determine whether there are underlying medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce Plaintiff's pain or other symptoms. *See* 20 C.F.R. § 404.1527 (2012). Then the ALJ must evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's ability to do basic work activities. *Id.* Whenever statements about the intensity, persistence, and limiting effects of Plaintiff's symptoms are not corroborated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire record. *Id.* The Commissioner has the discretion to evaluate Plaintiff's credibility and render an independent judgment based upon the medical findings and other evidence regarding the extent of symptomatology. *See LaCorte v. Bowen*, 678 F. Supp. 80, 83 (D.N.J. 1988).

Here, the ALJ determined that Plaintiff had the RFC for limited range of light work which had not been significantly compromised to the point of disability.

In making his decision, the ALJ relied on the following: 1) Plaintiff reported that he had no limitations and "just avoids prolonged walking or sitting because it increases his back discomfort"; 2) the fact that epidural injections provide relief to Plaintiff's back; 3) Plaintiff reported that he helps take care of his daughter while his wife works; 4) Plaintiff was not a candidate for back surgery; 5) Plaintiff was considered able to work as of April 4, 2006, with certain restrictions; and 6) the examinations of doctors that treated and provided consultative reports for the SSA regarding Plaintiff's physical and mental impairments generally concluded that Plaintiff's impairments were not disabling. (R. at 12-17.)

In light of the evidence relied upon by the ALJ, this Court concludes that the ALJ properly determined Plaintiff's RFC.

**E. Step Four: Whether Plaintiff had the RFC to perform the requirements of his past relevant work.**

At step-four the Commissioner must determine whether Plaintiff has the RFC to perform the requirements of his past relevant work. *See* 20 C.F.R. § 404.1520(f)(2012). The term "past relevant work" means work performed, either as Plaintiff performed it or as it is generally performed in the national economy, within the last fifteen years or fifteen years prior to the date that disability must be established. 20 C.F.R. § 404.1560(b)(2012). If Plaintiff does not have the RFC to perform any past relevant work, the analysis proceeds to the fifth step. 20 C.F.R. § 404.1520 (2012).

In step four, the ALJ properly determined that Plaintiff is unable to perform any past relevant work pursuant to 20 C.F.R. § 404.1565. Plaintiff has the past relevant work as a television reporter and a realtor. (R. at 17.) Since Plaintiff is limited to simple, routine tasks, the Commissioner correctly found that Plaintiff is unable to perform any past relevant work.

### F. Step Five: Whether Plaintiff is able to do any other work considering his RFC, age, education, and work experience.

At the last step of the evaluation process the ALJ must determine whether Plaintiff is able to do any other work considering his RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. *See* 20 C.F.R. 404.1520(f) (2012). If Plaintiff is able to do other work he is not disabled. (*Id.*) If Plaintiff is not able to do other work and meets the duration requirement, he is disabled. (*Id.*) The ALJ bears the burden of proof at this step. *See* 20 C.F.R. § 416.920(g)(2012); *Kangas*, 823 F.2d at 777. The SSA is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that Plaintiff can do, given the RFC, age, education, and work experience. *See* 20 C.F.R. §404.1512(g)(2012); § 404.1560(c) (2012).

The ALJ must consider whether Plaintiff has exertional or nonexertional limitations. *See* C.F.R. § 404.1569a(a)(2012). A limitation is exertional if it affects the Plaintiff's "ability to meet the strength demands of [a job]" such as "sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* A limitation is nonexertional if it affects the Plaintiff's "ability to meet the demands of [a job] other than strength demands." *Id.* If the limitations are solely exertional, the ALJ can use medical-vocational guidelines to determine whether Plaintiff can perform any other job in the national economy. *See* C.F.R. pt. 404, Subpart P, app. 2 (2012). Also, if Plaintiff retains the mental capacity to perform unskilled work, the ALJ may rely on the Medical Vocational Guidelines ("MVG"). *See Davis v. Astrue*, No. 08-928, 2009 WL 3241853 *at 6 (W.D. Pa Oct. 5, 2009). However, if there are both exertional and nonexertional limitations, the ALJ cannot depend on the guidelines to determine whether there are jobs in the national economy that Plaintiff can perform. *See Sykes v. Apfel*, 228 F.3d 259, 269 (3d Cir. 2000).

18

Under Section 416.963 a younger person (under the age of 50), with at least a high school education and previous work experience, is not disabled unless the ALJ finds particular limitations specific to the individual. *See* 20 C.F.R. §§ 416.963(c), 416.964(b)(4), 416.965 (2012). An ALJ must make an "assessment of factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base." 20 C.F.R. pt. 404, subpart P, app. 2 § 201.00(h)(3) (2012). Additionally, this finding "requires an individualized determination that considers the impact of the limitations or restrictions on the number of sedentary, unskilled occupations or the total number of jobs to which the individual may be able to adjust." *Id.*

Here, the ALJ found that Plaintiff had the RFC to perform the full range of light work, considering Plaintiff's age, education, and work experience; therefore, a finding of "not disabled" would be directed by Medical Vocational Rule 202.21 ("MVR"). The ALJ also found that "the additional limitations have little or no effect on the occupational base of unskilled light work as per SSR's 96-9p, 85-15, and C.F.R. 404.1527. (R. at 17.)

Plaintiff argues that the ALJ erred by not requiring the testimony of a vocational expert to testify as to how Plaintiff's mental impairment would limit his occupational base given his nonexertional limitations. (Pl.'s Br. 16.) The ALJ explained in his decision that while Plaintiff at one time had a GAF of 40, which signifies a low level of functioning, Plaintiff testified that he takes care of his daughter while his wife is at work. (R. at 15.) Plaintiff also testified that he could travel alone and get out daily. (*Id.*) Furthermore, the ALJ noted that reports from Dr. Handel in July 2007 and May 2008 noted that Plaintiff's ability to read, write, and perform series 7's was within normal limits. (*Id.*) Also, the ALJ relied on the assessment of Dr. Hecker in reaching his decision regarding Plaintiff's nonexertional limitations. Since the ALJ relied on

19

evidence that demonstrates that Plaintiff has the mental capacity to perform unskilled work, the ALJ was correct in relying on the MVG to determine Plaintiff's ability to perform other work. Thus, the ALJ's determination that Plaintiff could do other work was accurate.

**CONCLUSION**

For the foregoing reasons, the Court holds that substantial evidence supports the ALJ's decision. Accordingly, the Court **AFFIRMS** the judgment of the ALJ.

**SO ORDERED.**

s/Susan D. Wigenton
U.S.D.J.

Orig: Clerk
Cc: parties